NICHOLAS J. COSTELLO *vs.* DEPARTMENT OF PUBLIC
UTILITIES & another.[1]

Suffolk. December 8, 1983. — March 27, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Administrative Law,* Findings, Judicial review. *Public Utilities,* Judicial
review, Findings, Electrical transmission line.

Where the Department of Public Utilities, in denying a motion to reopen the
record in proceedings brought by an electric company seeking approval
of a proposed transmission line, simply summarized the arguments and
evidence presented by the parties and concluded that the moving party
had "failed to show good cause for the reopening of the record," this
court ordered the case remanded to the department for adequate subsidiary
findings on each issue raised by the motion. [530-537]

On appeal under G. L. c. 25, § 5, from the denial by the Department of Public
Utilities of a motion for reconsideration of an order and a request for
supplemental findings in a proceeding by an electric company seeking
approval of a proposed transmission line, this court was unable to review
the propriety of the department's denial of the motion, where the depart-
ment relied exclusively on a prior order denying a motion to reopen the
record and had made no subsidiary findings on the issues raised by this
motion. [537]

In a proceeding before the Department of Public Utilities by an electric com-
pany seeking approval of a proposed high voltage transmission line,
there was substantial evidence to support the department's conclusion
that "a health hazard from a facility of the type proposed herein has
not been established." [538-540]

In a proceeding before the Department of Public Utilities by an electric com-
pany seeking approval of a proposed transmission line, the department's
conclusion that neither necessity nor the public interest required place-
ment of the proposed line underground was not arbitrary or capricious.
[540-542]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on March 4, 1983.

[1] New England Power Company, intervener.

The case was reported by *Liacos, J.*

*Harvey Salgo* for the plaintiff.

*E. Michael Sloman,* Assistant Attorney General, for the defendant.

*John F. Sherman, III,* for the intervener.

HENNESSEY, C.J. This petition for appeal under G. L. c. 25, § 5, was filed in the Supreme Judicial Court for Suffolk County and reserved and reported to the full court by a single justice without decision. The petitioner, Costello, alleges error in decisions of the Department of Public Utilities (department) issued in connection with its January, 1983, approval of three petitions filed by New England Power Company (company). The company's petitions sought the department's approval on three matters necessary for construction and operation of a proposed 345 kilovolt electrical transmission line extending between the towns of Amesbury and Tewksbury.[2] The company's petitions sought the following: a determination that under G. L. c. 164, § 72, as amended through St. 1978, c. 322, § 1, the proposed line is "necessary for the purpose alleged, and will serve the public convenience and is consistent with the public interest," and that the company will be allowed to construct and use the line; a determination under G. L. c. 40A, § 3, that the transmission line be exempted from the zoning by-laws or ordinances of the affected cities and towns; and authority under G. L. c. 164, § 72, and G. L. c. 79, to take certain land by eminent domain.

Costello, a resident of a town through which the proposed transmission line will pass,[3] alleges error in the department's denial of his motion to reopen the proceedings after the record was closed, and of his motion for reconsideration and supplemental findings filed in response to the department's January 6, 1983, approval of the company's petitions. He then asserts

[2] These petitions are DPU Nos. 19559, 19630, and 19631.

[3] Neither the company nor the department challenges Costello's standing to file this petition and we therefore assume for the purposes of this appeal that he is an "aggrieved party in interest" under G. L. c. 25, § 5. Cf. *American Hoechest Corp.* v. *Department of Pub. Utils.,* 379 Mass. 408, 410-411 (1980).

error in the department's findings and rulings as to (1) health considerations and (2) underground transmission. We find no merit in Costello's two allegations of error concerning health considerations and underground transmission. We conclude, however, that the department's subsidiary findings are insufficient for us to review its denial of Costello's motions, and we remand the case to the department for further findings in support of those denials.

We summarize the agreed statement of proceedings. In June of 1978, the company commenced proceedings before the department for approval of the company's plans to construct and operate a 32.03 mile long, 345 kilovolt overhead electric transmission line that will pass through the towns of Tewksbury, Andover, Dracut, Methuen, Boxford, Groveland, Georgetown, West Newbury, Merrimac, and Amesbury, and the city of Haverhill. It filed the three petitions described above. In May of 1980, Costello intervened before the department, in opposition to the line. From May 13, 1980, to September 10, 1981, the department held fifteen days of hearings on the company's petitions. The company offered the testimony of nine witnesses in support of its petitions, and Costello offered three witnesses in opposition, each of whom testified under oath. In addition, the department heard numerous unsworn statements from local residents and governmental officials. The evidentiary record before the department closed in September of 1981. Subsequently, in February of 1982, Costello moved to reopen the record to admit further evidence regarding the need for the line and the feasibility of an alternate route. The department heard oral argument on this motion on May 12, 1982. On January 6, 1983, the department issued its final decision and order on the company's petitions. In this decision and order, the department granted each of the company's petitions and denied Costello's motion to reopen the record. On January 10, 1983, the company filed with the department a request for certain supplemental findings and clarification of certain language. On January 24, 1983, the department issued a second decision and order granting the company's request for supplemental findings and clarification. On January 28, 1983, Cos-

tello moved for reconsideration of the department's January 6 decision and order, and for supplemental findings. On February 9, 1983, the department issued a third decision and order denying Costello's motion for reconsideration and supplemental findings.[4] Costello filed a petition for appeal with the department and with the county court. On March 29, 1983, the company moved to intervene in this appeal by consent.

Costello first argues that the denials of his motions were an abuse of discretion. Second, he argues that the department's conclusions as to certain health matters were not supported by substantial evidence in the record. Third, he claims it was arbitrary and capricious, on the record before the department, to conclude that underground transmission was neither necessary nor in the public interest. We consider each claim below.

*Denial of Motion to Reopen.*

Costello sought to reopen the record before the department on the issue of the proposed line's necessity. He asserts that he alleged "good cause"[5] for the reopening based on two pieces of evidence not available to him until after the record was closed. Costello first offered a report from Robert Bigelow, an executive of the company (the Bigelow report). Costello alleges that the Bigelow report contains information which contradicts testimony of, and suggests misrepresentations by, the company's expert witness at the hearings before the department. The information at issue concerns the prospective construction of a 345 kilovolt transmission line between Scobie, New Hampshire, and Tewksbury, Massachusetts (the Scobie-Tewksbury line). The Bigelow report states the following about the Scobie-Tewksbury line: "If for some reason the line is not justified by other considerations and is not planned for service by the time the Quebec tie is built, it will have to be added at that time." According to Costello, this evidence bears directly

---

[4] The department made one further finding regarding underground transmission.

[5] Costello asserts Procedural Rules of the Department, Rule 11.8, provides that hearings may be reopened after having been closed, upon motion and showing of good cause. None of the parties argues that this standard for granting a motion to reopen is inappropriate.

on the department's consideration of the Amesbury-Tewksbury line. He points out, and the company's expert, Dr. Robert H. Snow, admitted that, so long as only one reactor at the Seabrook nuclear generation station (Seabrook I) is on line, the need for the Amesbury-Tewksbury line would largely be obviated if an alternative set of 345 kilovolt lines extending from Seabrook to Scobie and Scobie to Tewksbury were operational. He stresses that at the hearings before the department the company's expert indicated no studies on this alternative had been done other than as part of preliminary studies in 1974. Costello asserts the Bigelow report contradicts this denial of inquiry into the alternative lines. He further claimed in his motion that even if inquiry had not been undertaken when the company's expert testified in September of 1980, it must have been done by September, 1981, when the company submitted a report to the department on the Scobie-Tewksbury line: the Bigelow report was released on January 16, 1981. Nonetheless, he asserts, no evidence of such inquiry was presented to the department in September, 1981. In his motion to reopen the record Costello states that the company's failure to present this information has left "the record devoid of certain essential information," rendering "impossible" an "adequate assessment of the costs of certain appropriate alternative transmission configurations." He asserts that the company's nondisclosure "has resulted in the possibility of substantial prejudice to the Intervenor's interests."

The second piece of evidence which he argues supported his motion to reopen was a letter provided by the company to the department and the parties in connection with the company's opposition to the motion to reopen. The letter, dated April 12, 1982, was from the Public Service Company of New Hampshire (PSNH). It stated that "PSNH has initiated construction of the Seabrook-Scobie 345 kV line and expects to have it in service by August 31, 1983," and that "PSNH has determined that Unit #1 at Seabrook can operate at full load utilizing the Seabrook-Newington and Seabrook-Scobie 345 kV Lines as its transmission." According to Costello, this evidence that the Seabrook-Scobie line would be built before the Amesbury-

Tewksbury line constituted a substantial change in circumstances bearing on the need for and relative cost of the Amesbury-Tewksbury line. He again points to the company's expert testimony that while only one reactor is on line at Seabrook, an operational Seabrook-Scobie-Tewksbury 345 kilovolt line would obviate the need for an Amesbury-Tewksbury line, including elimination of the "locked-in" generation problem.[6] In sum, he asserts that the Bigelow report and PSNH letter present evidence which, if established, so undercuts the basis upon which the company rests its argument that the Amesbury-Tewksbury line is necessary, that there is no "coherent rationale" for finding the line necessary during the period in which only Seabrook I is operating. On this ground, he argues that the department's denial of the motion was improper.

The department and the company contest Costello's assertion that the Bigelow report and the PSNH letter warrant reopening of the proceedings. They state that the Bigelow report was not necessarily a statement that the Scobie-Tewksbury line would be built. And even if it were, they claim, the letter assumes the prior existence of two operating reactors at Seabrook and the Amesbury-Tewksbury line. The department then goes on to claim that if the second nuclear reactor at Seabrook (Seabrook II) is not built, the record shows the Amesbury-Tewksbury line will be necessary to transfer power from Seabrook I to southern New England whether or not other transmission lines are constructed. Accordingly, they argue that further inquiry on the record into the Seabrook-Scobie line would add nothing to consideration of whether the Amesbury-Tewksbury line is necessary.

Our review of the department's orders now before us is narrow. A petition under G. L. c. 25, § 5, which raises no constitutional issues requires us to review the department's finding to determine only whether there is an error of law. See *Sudbury* v. *Department of Pub. Utils.*, 351 Mass. 214, 230 (1966); *Wenham* v. *Department of Pub. Utils.*, 333 Mass. 15, 17

---

[6] The so called "locked-in" generation problem is the alleged inability to transport electrical energy generated by the Seabrook nuclear reactors into southern New England under the existing electrical transmission configuration.

(1955). General Laws c. 25, § 5, allocates to appellants the burden of proving such error. This burden is a heavy one. We give great deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority. G. L. c. 30A, § 14. See *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372, 385 (1982) ("When the issues and facts have been argued at length in adjudicatory hearings, and when the agency has made a reasoned record describing why rehearing was denied, we give great deference to the decision denying rehearing"). We will not substitute our judgment for that of the department on disputed questions of fact. See *Attorney Gen.* v. *Department of Pub. Utils.,* 390 Mass. 208, 228-229 (1983).

Limited though it may be, our review of petitions under G. L. c. 25, § 5, is not perfunctory. We carefully review the department's findings for error. To that end, we have noted G. L. c. 30A, § 11 (8), requires that "the [department's] decision 'be accompanied by a statement of reasons . . . including determination of each issue of fact or law necessary to the decision . . . .' A purpose is to require the agency to give a 'guide to its reasons' so that this court may 'exercise . . . [its] function of appellate review.' There is thus a 'duty to make adequate subsidiary findings.'" *Hamilton* v. *Department of Pub. Utils.,* 346 Mass. 130, 137 (1963), quoting *Leen* v. *Assessors of Boston,* 345 Mass. 494, 502 (1963). Absent such a statement of reasons, we are unable to determine whether an appellant has met his burden of proof that a decision of the department is improper. See *New York Cent. R.R.* v. *Department of Pub. Utils.,* 347 Mass. 586, 593 (1964); *Hamilton* v. *Department of Pub. Utils., supra.*

These principles of appellate review require that we defer consideration of Costello's appeal from the department's denial of his motion to reopen until the department makes subsidiary findings indicating the reasons it denied the motion. The findings made by the department in its order denying Costello's motion to reopen do not enable us to determine whether Costello has demonstrated that the denial was improper. The department's ultimate finding was that "[a]fter review of the arguments

advanced by the parties and the record in the present proceeding, we find that the intervenor Costello has failed to show good cause for the reopening of the record.'' This ultimate finding, however, is not based on any subsidiary findings containing a statement of reasons that allow us to determine the propriety of the order. Other than making its ultimate finding, the department simply summarized the positions of the parties.[7] It did

---

[7] "RESOLUTION OF MOTIONS TO DISMISS

"On February 17, 1982, intervenor Costello filed a motion to reopen the proceeding. Intervenor Costello contends that the Petitioner failed to provide essential information concerning the costs of certain appropriate alternative transmission configurations. During the course of a hearing on September 30, 1980, the Petitioner was asked to provide information concerning an alternative route for a transmission line from Seabrook to Tewksbury. The alternative route would go from Seabrook to Scobie to Tewksbury. In September, 1981, the information requested by the Department was provided by the Petitioner. Intervenor Costello contends that this information was never subject to cross-examination by him. Intervenor Costello also contends that the Petitioner, during the proceedings, knew that the Scobie-Tewksbury transmission would have to be constructed, regardless of the locus of the transmission line from Seabrook, if the Quebec-NEPOOL DC interconnection were to be placed in service. Thus, intervenor Costello has filed a motion to reopen so that an examination of this alternative may be examined and become part of the record.

''The Petitioner filed a response and a memorandum in opposition to the motion. The Petitioner contends that neither it nor Mr. Snow of NEPSCO, at the time of the proceeding, knew if the Quebec-NEPOOL DC interconnection were built, whether a 345 kv transmission line from Tewksbury, Massachusetts, to Scobie, New Hampshire, would also be constructed. Those decisions are made by the NEPOOL Executive Committee. The Petitioner submits that the record indicates that NEPOOL is presently examining the economics of whether the Tewksbury-Scobie line should be built and that a decision on this subject has not been made. Thus, the Petitioner avers that the present record remains accurate and complete, and intervenor Costello has failed to assert any reasoned basis for reopening the record.

''The Petitioner further contends that the record clearly demonstrates that constructing a 345 kv transmission line from Tewksbury to Scobie would not diminish the need for the proposed Tewksbury-Amesbury line. Mr. Snow testified on cross-examination that there are currently only two 345 kv lines linking northern and southern New England. The proposed Tewksbury-Amesbury line would interconnect the northern New England 345 kv grid at Seabrook, New Hampshire, thereby furnishing a third 345 kv tie between the regions. However, as Mr. Snow testified, NEPOOL is concerned that once the second nuclear generating unit at Seabrook comes on line, three 345 kv lines may not provide sufficient transmission capacity to allow for the transfer of economic energy between northern and southern

not indicate which arguments or evidence it found warranted a decision that the evidence presented by Costello did not constitute good cause to reopen the record. We have indicated previously that a summary by the department of arguments and evidence presented to it would not suffice as subsidiary findings to support a decision. See *New York Cent. R.R.* v. *Department of Pub. Utils.,* 347 Mass. 586 (1964). In *New York Cent. R.R.,* we stated that such a summary would be regarded "as only a statement of evidence and not as containing findings by the majority concerning the truth of the evidence." *Id.* at 589 n.2. The summary of evidence presented to us there was insufficient to allow us to perform our appellate function, and we remanded the case to the department for more complete subsidiary findings providing a statement of reasons for its decision. The findings of the department in the case at bar are deficient in the same way as those addressed in *New York Cent. R.R., supra.*

The only reasoning advanced for the department's decision here is that "[a]fter review of the arguments advanced by the parties and the record in the present proceeding, we find that . . . ." To uphold the department's decision here, therefore, would require us to speculate about rational explanations for the department's denial of Costello's motion by comparing the evidence he proposed to introduce with the existing record. This we decline to do.[8] While we can conduct a meaningful

New England. As Mr. Snow testified, NEPOOL is now examining whether or not it is economic to build a line from Tewksbury to Scobie as a fourth 345 kv tie linking northern and southern New England. Thus, the Petitioner contends that the present record clearly shows that the Tewksbury-Scobie line is being considered in addition to, not as a replacement for, the proposed Tewksbury-Amesbury line.

"After review of the arguments advanced by the parties and the record in the present proceeding, we find that intervenor Costello has failed to show good cause for the reopening of the record. Accordingly, his motion to reopen is denied."

[8] The department may have found Costello's evidence presented no "good cause" to reopen because it found the locked-in generation problem required construction of the Amesbury-Tewksbury line with only Seabrook I operating, even if the Seabrook-Scobie-Tewksbury line were built. Alternatively, it may have found that the proposed construction of Seabrook II made Costello's evidence unimportant. It may, however, have had some totally different reason for its denial of the motion.

review of "a decision of less than ideal clarity if the agency's path may reasonably be discerned," we will not "supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-286 (1974).

In *Hamilton* v. *Department of Pub. Utils.*, 346 Mass. 130, 143 (1963), we employed this principle of review in remanding to the department for further findings a case in which the department's findings appeared perfunctory: "The decision summarily rejects the proposals of the Hamilton parties to place parts of the line underground as supported only by 'aesthetic considerations' involving 'greatly increased costs' and because the claimed adverse effect on property values was exaggerated. These summary findings are inadequate to enable us to determine whether the decision to subordinate these general welfare factors is in the public interest. Indeed, the findings suggest that the department, wrongly, may have failed to give these factors any appreciable weight." See also *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination,* 361 Mass. 352, 354-355 (1972) ("We recognize that where the evidence is conflicting, the administrative agency is charged with the responsibility of making findings of fact and is in the best position to judge the credibility of the witnesses. . . . However, that rule does not relieve an agency of its duty to make subsidiary findings of fact on all issues relevant and material to the ultimate issue to be decided. Nor does it relieve the agency of the duty to set forth the manner in which it reasoned from the subsidiary facts so found to the ultimate decision reached"); *Northeast Airlines, Inc.* v. *Civil Aeronautics Bd.*, 331 F.2d 579, 586 (1st Cir. 1964) ("Courts ought not to have to speculate as to the basis for an administrative agency's conclusion").

In substance, our conclusion is that Costello's motion raised issues concerning the relationship among three elements (the construction schedule of Seabrook II, the Amesbury-Tewksbury line, and the Seabrook-Scobie-Tewksbury line). The department made findings as to none of these issues. This case must be remanded to the department for further subsidiary

findings. The department must provide us with a statement of reasons which explains the basis for the department's denial of Costello's motion to reopen so that we will be able to conduct our appellate review. See generally *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination, supra* at 355.

*Motion for Reconsideration and Request for Supplemental Findings.*

Costello next challenges the department's February 9, 1983, denial of his motion for reconsideration and request for supplemental findings. Costello made this motion in response to the department's January 6, 1983, order denying Costello's motion to reopen the proceedings and approving the company's petitions. We do not address whether the department's denial of this motion was improper because its decision relied exclusively on its prior order dismissing Costello's motion to reopen. The department stated as its basis for denying Costello's motion for reconsideration the following: "The grounds advanced to support [Costello's] earlier motion [to reopen] are nearly identical to a number of those presented on reconsideration with regard to the instant motion. . . . Therefore, upon review of the Motion of Intervenor Costello and the response of the Company, we find insufficient reason to grant this Motion. Intervenor Costello has merely attempted to relitigate issues decided in the case-in-chief." Until the department makes findings regarding its denial of Costello's motion to reopen, we cannot review its denial of his motion for reconsideration and supplemental findings. While the department has broad discretion in denying such motions for reconsideration, the denial must be based on a "reasoned record describing why rehearing was denied." *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372, 385 (1982).[9]

---

[9] We note that no subsidiary findings or reasoning in the January 6, 1983, order aid us in determining whether the department's denial of Costello's motion for reconsideration and supplemental findings was improper. The department's findings as to the purpose and necessity of the proposed transmission line contained in the January 6, 1983, order also are summary statements of the evidence presented to the department.

We proceed to consider the other two issues raised on appeal by Costello. As to these issues, there are adequate findings for us to review the department's decisions.

*Health Considerations.*

Costello next argues that the department's conclusions concerning the potential health effects from exposure to the proposed Amesbury-Tewksbury line were arbitrary and capricious and not based on substantial evidence in the record. The basis of his challenge to the department's conclusion that "a health hazard from a facility of the type proposed herein has not been established" is twofold. First, he asserts that the department's subsidiary findings are inadequate. Second, he claims the department's reliance on the testimony of Dr. Gordon J. Stopps was improper. Costello states that this "reliance is misplaced and cannot be supported by substantial evidence in the record." We find no merit in either allegation of error.

The department's subsidiary findings are adequate to support its conclusions. Although an agency must make all findings necessary to its decision (G. L. c. 30A, § 11 [8]), it need not make detailed findings of all evidence presented to it, as long as its findings are sufficiently specific to allow us to review the department's decisions. See *Maddocks* v. *Contributory Retirement Appeal Bd.,* 369 Mass. 488, 497 (1976). Cf. *Hamilton* v. *Department of Pub. Utils.,* 346 Mass. 130, 137 (1963). Here the department summarized the evidence presented concerning possible health hazards of the proposed transmission line. It then went on to state it found the evidence of Dr. Stopps particularly convincing and the alleged adverse health impact "at the most only conjecture at this time." To the extent that Costello seeks more than this, i.e., a specific finding that the proposed transmission line is not a health hazard, he seeks more than we have required. See *Framingham* v. *Department of Pub. Utils.,* 355 Mass. 138, 147 (1969). These subsidiary findings are sufficient for us to determine whether the department's decision was "[b]ased upon an error of law," or "[u]nsupported by substantial evidence" or in some respect "not in accordance with law." G. L. c. 30A, § 14 (7), as amended through St. 1976, c. 411, §§ 1, 2. *Hamilton* v. *Department of Pub. Utils., supra* at 137.

Costello's argument that the department's reliance on Dr. Stopps' testimony is unsupported by substantial evidence has equally little merit. Our review under the substantial evidence test is limited; we will uphold the department's decision "as long as the findings by the authority are supported by substantial evidence in the record considered as a whole." *1001 Plays, Inc.* v. *Mayor of Boston,* 387 Mass. 879, 885 (1983). Substantial evidence is that evidence which "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6), inserted by St. 1954, c. 681, § 1. *Almeida Bus Lines, Inc.* v. *Department of Pub. Utils.,* 348 Mass. 331, 341 (1965). While we are attentive to evidence detracting from the department's decision in considering whether substantial evidence supports a decision, *1001 Plays, Inc.* v. *Mayor of Boston, supra* at 885, we also give "due weight to the experience, technical competence, and specialized knowledge of the agency," G. L. c. 30A, § 14. *Brookline* v. *Commissioner of Dep't of Envtl. Quality Eng'g, supra* at 390. Cf. *Arthurs* v. *Board of Registration in Medicine,* 383 Mass. 299, 304-305 (1981).

Here the testimony of Dr. Stopps was presented along with other testimony concerning health risks from the proposed transmission line. Dr. Stopps, an epidemiologist, studied the health of a group of workers exposed to extra high voltage (500 kV) and high voltage (230 kV to 115 kV) power lines as compared with a control group who were not exposed. He testified that the results of the study were that the highly exposed workers suffered no special health problems. He then noted that his findings "are in keeping with those of a Swedish study and of the study of ten United States linemen . . . [but] are at variance with the Soviet and Spanish studies of switchyard workers." He also observed that "in none of the studies have men exposed only to the high voltage environment of transmission lines alone been found to have unusual medical complaints or findings." Costello presented no evidence requiring the department to disregard this testimony. The department had the discretion either to believe or disbelieve Dr. Stopps. *Framingham* v. *Department of Pub. Utils.,* 355 Mass. 138,

146 (1969). After discussing other evidence presented to it, the department found Dr. Stopps' testimony reliable. There was substantial evidence in the record to support this conclusion. We will not substitute our judgment for that of the department on such contested factual matters. "Our task under the State Administrative Procedure Act (G. L. c. 30A, § 14 [7]) is not to decide the issues anew but to determine whether there was any error of law." *Attorney Gen.* v. *Department of Pub. Utils.,* 390 Mass. 208, 228-229 (1983). Cf. *Arthurs* v. *Board of Registration in Medicine, supra* at 310-311. We find no error of law in the department's reliance on Dr. Stopps' testimony.

*Underground Transmission Lines.*

Costello's final allegation of error rests on the department's "analysis" of an underground alternative to the proposed overhead transmission line. The department found that neither necessity nor the public interest requires placement of the proposed transmission line underground. Costello challenges the cost analysis upon which this finding was made. According to Costello, the department relied on two different standards in not requiring the transmission line to be placed underground. He focuses on two statements by the department. The first was in the January 6, 1983, order; the second was in the department's February 9, 1983, order on Costello's motion for reconsideration. In the January 6 order, the department found "the significantly greater capital investment" required by an underground line in contrast to an overhead line made the underground line neither necessary nor in the public interest. In the February 9 order, the department found "the economics favor the overhead alternative." Costello argues as follows: "[these] are very different standards and . . . are not consistent. To move from one in January to another in February . . . is arbitrary and capricious." There is no merit to this position.

The department acted neither arbitrarily nor capriciously in not requiring underground construction of the proposed transmission line. At best, Costello's argument is that the verbal differences in the department's two orders reflect a casual treatment by the department of the underground construction

issue and a decision either not based on or not supported by
the evidence. We do not view the two findings by the depart-
ment as inconsistent. Neither do we understand them to suggest
arbitrary or capricious conduct by the department. There is
ample evidence in the record upon which the department
reasonably could find the cost of constructing an underground
transmission line prohibitive. Moreover, the department made
clear its consideration of the record by summarizing key pieces
of evidence in its subsidiary findings.[10] "We are satisfied that

---

[10] "*Underground Construction*

"A wide range of estimated costs was introduced for the proposed over-
head circuit and for each of the alternative underground systems. In consid-
ering the estimates presented by the Petitioner and intervenor Costello, we
will start with a review of the adjustments proposed by Dr. Graneau to the
estimated construction cost of the proposed overhead circuit.

"There was testimony that lightning arrestors are not used on transmission
circuits of this class because lightning arrestors would not improve the
lightning stroke resistance of this line over that provided by the dual static
conductor grounding proposed by the Petitioner. After review, we find that
Dr. Graneau's recommendation that the service continuity of the circuit
would be improved by the installation of lightning arrestors is not supported
by the evidence in the record, and the $2,000,000 additional cost he proposes
is not justified. Further, the testimony of Mr. Cartwright relative to the
estimated cost of installation of phase and static conductors controverts the
contention of Dr. Graneau that the Petitioner's estimate of such cost is
deficient in the amount of $1,698,000, and this adjustment will not be
made. We have also examined the testimony relative to the relocation of
the 115 kv circuits, Y-151 and G-133, parallel to the proposed 345 kv
circuit and upon the existing right-of-way. We conclude that the width of
the right-of-way required by the proposed 345 kv circuit is such that this
relocation may become necessary and the estimated expenditure of
$1,225,000 should be added to the estimated construction cost of this pro-
jection at least for purposes of comparing cost estimates. Thus, the construc-
tion cost for the overhead transmission facility with this one adjustment
would be the sum of $14,812,000 and the $1,225,000, for a total of
$16,037,000.

"However, even if we were to accept all of Dr. Graneau's adjustments
and use his figure of $19,734,000 for the cost of the proposed overhead
project, and if we were to accept, without adjustment, his alternative,
self-contained underground system data [at] a cost of $51,348,000, the
record would indicate that the economics favor the overhead alternative by
better than 2.5 to 1. Further, Mr. Allen and Mr. Moran provided estimates
which raise serious doubts about the accuracy of Dr. Graneau's estimate.
Finally, the feasibility of burying a major portion of the transmission line

the department did make clear and detailed findings and reported enough of the evidence on which those findings were based to show that it weighed all the factors, and to enable us to determine that its decision . . . was free from error of law.'' *Sudbury* v. *Department of Pub. Utils.,* 351 Mass. 214, 230 (1966). We uphold the department's decision on this issue. Cf. *Boston Gas Co.* v. *Department of Pub. Utils.,* 368 Mass. 780, 795-796 (1975).

*Conclusion.*

Judgment shall enter in the county court affirming the department's January 6, 1983, decision in so far as it concerned health considerations and underground transmission, and remanding to the department for further findings on the denial of Costello's motions to reopen and for reconsideration.

*So ordered.*

---

in the median strip of Interstate Route 495 is unsupported on the record, thereby calling into question the very legitimacy of Dr. Graneau's proposal.

"The operational advantages of the underground installation of electric power circuits have been reiterated in this proceeding. The disadvantages are not less significant. Experience in the operation of 345 kv underground circuits in sections of the length and capacity proposed here has been limited in the United States and none in service is self-contained cable. The incidence of failure may prove less in underground facilities; but the duration of outage to locate and repair will be greater. The potential problems of operating an underground circuit as a segment of an extensive 345 kv overhead transmission network have not been fully explored.

''While the operational considerations are of concern, it is the significantly greater capital investment which would be required which leads us to conclude that requiring that the transmission line be placed underground is neither necessary nor in the public interest.''